## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | | |
|---|---|---|---|
| PHYLLIS JAGER, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case No.: 4:25-cv-364 | |
| | ) | | |
| PEDRO SANTIAGO, | ) | **JURY TRIAL DEMANDED** | |
| | ) | | |
| Defendant. | ) | | |

## COMPLAINT

Plaintiff Phyllis Jager ("Jager"), by and through undersigned counsel, Blitz, Bardgett & Deutsch, L.C. and Bienert Katzman Littrell Williams LLP, as and for her Complaint against Defendant Pedro Santiago ("Santiago") alleges as follows:

### INTRODUCTION

1.      Santiago, who goes by "Mr.Betonyou," has a YouTube channel that has over 83,000 subscribers.

2.      This action arises from a series of plainly defamatory statements that Santiago made about Jager in a video that he posted on his YouTube channel (https://www.youtube.com/watch?v=AOqaCLfLpsg (the "Video")) on March 18, 2025.

3.      As of the filing of this Complaint, the Video has been viewed over 6,600 times.

4.      Santiago knew and made light of the fact that he defamed Jager during the Video. At the beginning and at the end of the Video, Santiago said to Jager, "Please don't sue me."  And in the comments section, Santiago responded to the statement by a user – "You just defamed her" – by inserting an emoji that he was laughing so hard he was crying:



5.     Disseminating knowingly false statements on the internet about Jager is not a laughing matter.

6.     Upon information and belief, Santiago did not bother to verify the article he read from which was filled with poorly written, inaccurate information, nor did he bother to read Jager's actual court filing.

7.     Given Santiago's low number of likes per video, it appears as though he was looking for a quick bump-up in his audience, a click-boost, and more likes than he ever had before.  He grabbed the poorly written article hot off the press and took to the stage to defame Jager.

8.     Through this action, Jager seeks redress for the severe reputational harm caused by Santiago.

**PARTIES**

9.     Jager is an individual domiciled in Orange County, New York.  Jager is the Chief Executive Officer of zuMedia, Inc. ("zuMedia"), a company headquartered in New York.

10.     Santiago is an individual domiciled in this District.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  Jager is a citizen of New York, Santiago is a citizen of Missouri, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Santiago because he is domiciled in this District.

13.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred within this District.

## FACTUAL ALLEGATIONS

**I.      zuMedia**

14.     zuMedia is an innovative company that seeks to create groundbreaking technologies that can level the playing field for consumers, all with a sense of fun and the goal of allocating a substantial portion of its revenue to support humanitarian causes.

15.     zuMedia's myriad of revenue-generating projects are meant to behave as a "mule" to continuously and perpetually fund its offerings aimed at societal betterment.  zuMedia works on behalf of the all people across the nation and the world beyond.

16.     zuMedia's impeccable reputation, together with its stellar leadership, is of the utmost importance in order to maintain its ability to serve and service the public in the manner it so does.

17.     zuMedia has multiple brands that cater to internet and social media platform users, including DMDb.com.  DMDb.com's website features a unique social media platform on which users can, among other things, display artwork, livestream events, host watch parties, broadcast videos and email and direct message each other.  DMDb.com also provides an online digital media database which provides information concerning the cast, crew, producers, developers and/or creators of a vast array of digital media content including, without limitation, motion pictures, television series, advertisements, websites, video games, NFT's and viral videos.

18.    zuMedia also owns Backskin, a patented advertising platform that has the potential to completely change Internet advertising by, among other things, enabling Internet users to rent advertising space on their profile pages, creating revenue for both the user and the platform owner, and allowing advertisers to more precisely target their audiences.

19.    A former wall street certified financial analyst provided a valuation declaring Backskin with a valuation higher than any other company or entity in existence today.

20.    Therefore, Jager certainly does not need any money from DoorDash, as falsely stated by Santiago.  Regardless of any potential outcome of the case, Jager is entitled and guaranteed the right to legally challenge DoorDash under the First Amendment of the Constitution of the United States without having Santiago publicly falsely accusing her of doing so in bad faith or under false pretenses.

21.    Jager and zuMedia have a vested financial interest in maintaining a positive image and reputation among avid Internet users and, specifically, YouTube users.

22.    Among other things, the goal of zuMedia is to allocate a significant portion of its profits to an entity known as United States Oversight ("USO").  USO will assist vulnerable citizens who are unable to obtain important services from local, state and the federal governments.

## II.    The DoorDash Lawsuit

23.    zuMedia operates a think tank from offices located in Monroe, New York.

24.    Jager regularly ordered meals using DoorDash for zuMedia's employees at the Monroe offices as well as for the many contractors who provide maintenance, construction, and landscaping services at and around these offices.  In fact, Jager believes she, on behalf of zuMedia, was among DoorDash's most significant users (by volume and dollar amount) as, by using food delivered by DoorDash, zuMedia regularly fed approximately 150 people every business day. Since

2021, Jager, on behalf of zuMedia, spent at least $3.4 million on food via DoorDash, placing not less but likely more than 4,380 orders.

25.     Jager has significant technological expertise and experience, and by placing over 4,000 orders for food delivery, she was uniquely positioned to observe the workings of DoorDash.

26.     In November 2024, Jager advised DoorDash of her concerns regarding DoorDash's systemic failure to maintain adequate safety and security practices, including but not limited to (1) DoorDash's failure to adequately vet the backgrounds and criminal records of its drivers, (2) DoorDash's complete failure to vet at all individuals who accompany DoorDash drivers on deliveries, (3) DoorDash's failure to enforce DoorDash's prohibition on the sharing of accounts by drivers, and (4) DoorDash's failure to impose reasonable controls over the photographs of deliveries taken by DoorDash drivers.

27.     In response to Jager raising the above-described valid concerns about DoorDash's operations, DoorDash retaliated against Jager by, *inter alia*, falsely accusing Jager of fraud, deleting internal records relating to Jager's purchase history, and terminating Jager's DoorDash account.

28.     On December 2, 2024, Jager filed a complaint against DoorDash in the United States District Court for the Southern District of New York alleging causes of action for breach of contract and declaratory relief.  This matter was captioned *Jager v. DoorDash, Inc.*, 24-cv-09195-KMK (S.D.N.Y.) (the "Prior DoorDash Action"), and was voluntarily dismissed on March 7, 2025.

29.     On March 10, 2025, Jager filed another complaint in the United States District Court for the Southern District of New York against DoorDash for breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, fraud, declaratory relief, false advertising pursuant to 15 U.S.C. § 1125, deceptive conduct pursuant to N.Y. General Business Law

§ 349, and false advertising pursuant to N.Y. General Business Law § 350 in the matter captioned *Jager v. DoorDash, Inc*., Case No. 7:25-cv-01929 (S.D.N.Y.) (the "DoorDash Action").

30.    The complaint in the DoorDash Action was filed in accordance with Rule 11 of the Federal Rules of Civil Procedure whereby Jager's attorney certified among other things, that:

(1)    it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2)    the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and

(3)    the factual contentions have evidentiary support or, if specifically, so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

31.    The DoorDash Action focused on the issues raised in Jager's November 2024 notice to DoorDash as well as DoorDash's fraudulent charging users $2.99 for purported express deliveries even though such orders were not expedited, DoorDash pocketing its drivers' tips and DoorDash doing business with minors, some as young as seven years old.

32.    The complaint in the DoorDash Action contained substantial proof of the allegations therein.

33.    Jager's attorney certified the complaint's allegations under Rule 11.

34.    Santiago chose not to read the complaint and educate himself on the proceedings, but rather for instant gratification with his audience, opted instead to accuse Jager of being a liar.

35.    The purpose of the DoorDash Action is to bring about change and to protect the safety of users of DoorDash such as Jager.

36.    On March 18, 2025, a website called The Register published a media story about the Prior DoorDash Action and the DoorDash Action, titled "DoorDash sued for allegedly branding

customer a fraudster after delivery photo query,"[1] which provided a cursory and less than accurate summary of the DoorDash Action.

## III.    The Video

37.    According to his YouTube profile, Santiago works in the "gig economy as a delivery driver and content creator,"[2] and is a "Gig lifer, father, and motivator" according to his Instagram account.[3]

38.    Santiago goes by the moniker "mr.betonyou" or "Mr.BetonYou" on social media platforms, including Instagram and YouTube.

39.    Santiago's YouTube channel has approximately 83,800 subscribers as of March 20, 2025.

40.    YouTube has approximately 2.5 billion monthly active users worldwide.

41.    On March 18, 2025, Santiago posted the Video regarding the DoorDash Action after reading the media story about the DoorDash Action on The Register.

42.    The Video contains a number of defamatory statements about Jager, who Santiago identifies as "a CEO of New York-based creative agency zuMedia."

43.    Upon information and belief, Santiago made these false statements to garner attention to his YouTube channel and increase the number of viewers for that channel, which subsequently, was the result of his actions.

44.    Santiago dunked off of Jager's name and her associated DoorDash legal proceedings for the sole purpose of boosting his digital presence.

---

[1]        https://www.theregister.com/2025/03/18/doordash_sued_customer_fraudster/

[2]        https://www.youtube.com/@Mr.Betonyou

[3]        https://www.instagram.com/mr.betonyou/

45.     In the Video, Santiago falsely stated that Jager filed the DoorDash Action because she could not have McDonald's food delivered to her:

> The complaint reads "But upon Jager verifying the card she used for her account DoorDash informed her it was cancelling her account because according to DoorDash she was fraudulently using a card that does not belong to her."

> "That's just a thing, you can't.  It is what it is, I mean she's so mad because she can't get her McDonald's delivered. People are stupid . . . "

> "The new complaint has expanded from 17 to 83 pages.  Oh lord.  Over some McDonald's orders and some photographs."

46.     While Santiago labored to dazzle his audience with his B-rated entertainment involving McDonald's, factually, Jager has never eaten McDonald's food.

47.     Here again, Santiago offered baseless and false claims to his viewing audience at Jager's expense.

48.     Jager did in fact file the lawsuit as a result of grave concerns she had for her own safety as well as for the safety of the public.

49.     Prior to filing the DoorDash Action, Jager extended her expertise and assistance at no cost to DoorDash with the hope of ensuring safer systems, protocols, and practices within DoorDash's operating procedures.  DoorDash ignored Jager.

50.     Within weeks of Jager reaching out to DoorDash with her offer of assistance to improve public safety in the use of its product, and after DoorDash ignored Jager there were, among countless other incidents, two shootings that likely would not have occurred had DoorDash not been so negligent as to ignore the fact that such issues exist.

51.     Media reports indicate that, on December 26, 2024, a DoorDash customer in Jackson County, Michigan was shot shortly after a DoorDash delivery, either by the Dasher or by a third party who was present in the Dasher's vehicle; investigators determined there were two people in

that vehicle.  Further reporting indicated that the shooter had a criminal record.[4]  A news report quoted a DoorDash spokesperson as denying that the shooter was a Dasher, and the victim claimed she had been told the shooter was using another Dasher's account.[5]

52.    In September 2023, a woman in Cincinnati, Ohio, was reported to have been sexually assaulted by a male DoorDash driver who was using the Dasher account of a woman in South Lebanon, Ohio.[6]

53.    In December 2023, a media report described a scheme in which a Dasher and a minor worked together to steal items from a property under the guise of making a DoorDash delivery to the property.  The scheme entailed the minor going around the side of the house to steal property while the Dasher approached the front door under the pretense of making a delivery. While this Dasher was engaged in fake deliveries, it could have worked just as easily with routine deliveries. As an investigator interviewed in connection with the incident commented, "This is a textbook case of a very familiar business, and somebody being employed by that business, has used the cover of that business to commit a crime."[7]

54.    In March and May 2023, fatal motor vehicle accidents occurred in Milwaukee where unlicensed drivers, who nevertheless had been approved as Dashers and presumably passed background checks, struck and killed a total of six people. Media reporting indicated that both

---

[4]    Felon Charged with Attempted Murder In Jackson County DoorDash Shooting, December 30, 2024, https://www.mlive.com/news/jackson/2024/12/felon-charged-with-attempted-murder-in-jackson-county-    doordash-shooting.html

[5]    Woman arrested in Jackson County DoorDash shooting, Jan. 3, 2025, https://www.wilx.com/2025/01/03/woman-arrested-jackson-county-doordash-shooting/

[6]    *See* https://midmichigannow.com/news/nation-world/woman-allegedly-licked-groped-by-doordash-driver-suspect-charged-with-assault-jonibek-rakhimov-chilis-delivery-lauren-taylor-gross-sexual-imposition-charge-account-deactivated
[7]    *See*    https://www.walb.com/2023/12/18/lee-co-sheriffs-office-asking-help-identifying-suspected-door-dasher/.

drivers had their licenses suspended after prior driving offenses. While DoorDash denied that these drivers were delivering for it at the time of the accidents, it gave no explanation for how these people were able to become Dashers, or to stay as Dashers available for deliveries.[8]

55.    On November 17, 2021, a Dasher working in Hamden CT, who previously had made DoorDash food deliveries to an address, returned to the location and forcibly entered the residence, while also planning to forcibly enter another, with the intention of burglarizing the residences.  Upon further investigation, the Dasher confessed that the act of these burglaries was motivated by his quest for sexual excitement that the illegal acts would supposedly bring.

56.    While Santiago claims that taking photos presents no threat or causes any harm, there was plenty of picture play included in the attack by the Hamden Dasher offender, according to the case documents.

57.    Santiago has only made himself aware enough of the criminality rampant within DoorDash and by some of its Dashers as to making himself famous, but not enough to actually know what he was talking about.

58.    There is an enormous number of dangerous cases that involve burglary, sexual assault including rape, theft, shootings, stalking, and human trafficking.

59.    While Santiago was clearly aware of the complaint in the DoorDash Action, he apparently never read it.

60.    In the Video, Santiago falsely stated that Jager lied about placing orders amounting to over $3.4 million with DoorDash for personal financial gain, stating:

"She whose company initially claimed to have placed 2 million in DoorDash orders since 2021.  Excuse me?  So, she claimed, in three years she's ordered $2 million of food. Right

---

[8]    https://www.tmj4.com/news/project-drive-safer/unlicensed-drivers-charged-in-deadly-crashes-working-as-doordash-drivers-on-the-side-complaint-shows; https://www.foxnews.com/us/wisconsin-doordash-driver-with-suspended-license-charged-striking-killing-pedestrian-reports.

now, I'm going to call baloney, BS Phyllis, you're saying that because you want money from DoorDash . . . ."

"3.4 million you've ordered? That's a lot of money. Maybe you got some big orders there. I'm not saying it's not valid but that's crazy. That's crazy. So you mean to tell me you think DoorDash would ban somebody's account that has ordered $3.4 million worth of food? No. Phyllis, I'm calling you out right now. You're lying  . . ."

61.     Factually, Jager has indeed spent approximately $3.4 Million using DoorDash's service.

62.     Factually, DoorDash has records of Jager's approximate $3.4 Million expenditure.

63.     Factually, DoorDash acknowledges Jager as a top tier spender.

64.     Factually, Jager swore to her approximate $3.4 Million expenditure under penalty of perjury.

65.     Factually, Santiago is absent of any facts that would support his false claim that Jager did not spend approximately $3.4 Million nor the approximate $2 Million mentioned from a previously filing.

66.     In the Video, Santiago falsely stated that Jager alleged that DoorDash overcharged customers for "Express Delivery" because she was "mad" about the cancellation of her DoorDash account, stating:

"The fraud allegation arises from the claim that DoorDash's $2.99 express fee for faster delivery doesn't actually accelerate delivery . . . Four dashers acknowledge that they have no knowledge of the express delivery option being part of the order adding that there was nothing visually reflecting that option on their phone and two dashers claimed that to have delivered the order in a direct manner with no additional order just prior."

"Listen most of the time what'll happen is if we don't know about it, but it'll be the first order in a stack order that we have to complete, or they won't stack it at all. Listen DoorDash is a scummy company, I get it Phyllis, but stop.  Please stop trying to take advantage.  Please stop.  You're mad because you can't order."

67.     In the Video, Santiago falsely stated that Jager lied about being retaliated against by DoorDash, stating:

"But you think they really, you really think they would deactivate you from ordering when you've ordered $3.4 million worth of food. I call crap, Phyllis . . ."

68.    Here again Santiago, without basis of fact, falsely states that DoorDash did not deactivate Jager's account after spending approximately $3.4 Million.

69.    DoorDash did in fact deactivate Jager's account on or about November 21, 2024, after Jager called DoorDash out on its system flaws, schemes, scams, lies, and danger to the public.

70.    The complaint in the DoorDash Action filed under Rule 11 of the Federal Rules of Civil Procedure asserts that DoorDash did in fact deactivate Jager's account, after spending "$3.4 million in food."

71.    This is a public filing that Santiago could have read in order to gather correct information but rather chose to recklessly defame Jager.

72.    DoorDash did in fact acknowledge that it deactivated Jager's account.

73.    In the Video, Santiago falsely stated that Jager filed the DoorDash Action for personal financial gain:

"Some people that are like sue happy they're just so funny because they exaggerate everything just to try to get some money or prove a point that's really irrelevant. . . ."

"I think a lot of court people, a lot of people sue and they bog up the system and they waste time in hopes to just get a quick payday from DoorDash.  This is embarrassing Phyllis, you should be embarrassed."

74.    Santiago's association with DoorDash gave credence to his false statements about Jager.

75.    According to the statistics reported by YouTube, the 11-minute Video has been viewed approximately 6,600 times:



76.    Santiago knew that he made defamatory statements during the Video, as the video begins and ends with the statement, "Please don't sue me."

77.     Worse still, Santiago continued to make defamatory statements in the comments section on the Video.

78.     In the comments section, Santiago falsely stated that Jager lied about spending approximately $3.4 million on DoorDash, stating:



79.     In the comments section, Santiago falsely stated that Jager was "crazy":



80.     In the comments section, Santiago falsely stated that it was "impossible" for Jager to order $3.4 million for zuMedia employees and contractors:



81.     But Santiago can't possibly have known that as a fact.

82.    Santiago does not know Jager.

83.    Incited by Santiago, the comments section on the Video are littered with false and malicious statements made by others about Jager, including comments stating that she is a criminal and comments stating that she filed the DoorDash action for personal financial gain:










84.    By inciting viewers, many of whom, upon information and belief, are DoorDash drivers, Santiago effectively put a target on Jager's back and placed her in physical danger.  As detailed in the complaint in the DoorDash action, a not insignificant number of DoorDash drivers have engaged in violent criminal conduct such as assaults, rapes and homicides, while others are undocumented immigrants.  Santiago's hate-filled comments have the potential to create a mob mentality and inspire members to locate, stalk and/or physically harm Jager.

85.    The Video received approximately 6,100 views on the first day that it was posted. Given the global reach of YouTube and the ease of sharing YouTube videos, the number of potential viewers of the Video is enormous.

86.    When media is posted to the Internet and then shared, exposure becomes exponential.

87.    Santiago's false statements about Jager's credibility will make it much more difficult for Jager and her company, zuMedia, to market and sell its Backskin and other products,  form partnerships and strategic relationships with other companies, recruit and hire employees and obtain business insurance, particularly insurance covering reputational risk.

88.    Among other things, the damage to Jager's reputation caused by Santiago's false statements about Jager have damaged and will continue to damage zuMedia's brands such as fatSu, Backskin, PalmPens, DMDb, and others while making businesses and the general public hesitant to use the services provided by SickBank.

89.    Jager has spent numerous years creating pillars of sustainable protective human services, working intensely on behalf of the American people, and intends to announce her candidacy for the office of the President of The United States and had purchased the domain name

Mr.President.com for this purpose.  Santiago's defamatory statements have the potential to kneecap Jager before she even has an opportunity to run for office.

90.     Ironically Santiago, in another YouTube video installment, had just previously that very same day recorded (while actively driving) and posted a 6-minute video preaching how he was no longer going to trump up salacious garbage, filth, nonsense and falsities regarding people he did not know.



## FIRST CAUSE OF ACTION
### (Defamation – Slander and Libel)

91.    Jager restates the allegations set forth in Paragraphs 1 through 90 above as if fully set forth herein.

92.    Ms. Jager is a private figure and has not sought or otherwise been thrust into the public spotlight.

93.    On the Video and in the comments section on the Video, Santiago made assertions of fact about Jager in relation to the Prior DoorDash Action and the DoorDash Action.

94.    These purported factual statements were false at the time they were made and continue to be false.  The statements were transmitted by Santiago to his over 83,000 subscribers and are now available to everyone on the Internet.  Santiago knew his statements were false and defamatory at the time he made them or acted with reckless disregard as to the truth or falsity of his statements at a time when he had serious doubts about their truth.  At a minimum, Santiago failed to exercise reasonable care in broadcasting these false and defamatory statements.

95.    Santiago acted willfully and maliciously.

96.    Santiago's false statements impugn the integrity of Jager and are the direct, immediate, and proximate cause of irreparable damage to Jager's reputation in the marketplace rendering these statements defamatory per se such that Jager is entitled to damages in an amount to be determined at trial but believed to be at least $2,000,000.

## JURY TRIAL DEMANDED

97.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Jager demands judgment against Santiago for the following:

A.  Compensatory damages in the amount of not less than $2,000,000;

B.  Consequential damages;

C.  Punitive damages;

D.  Attorneys' fees, costs of suit and expenses;

E.  Injunctive relief directing Santiago to take steps to remove the Video, post a video of apology and clarity, an acknowledgement of the harm and damage directly caused by his reckless false statements, and the comments thereon from YouTube; and

F.  Such other relief as the Court deems just and equitable.


Dated:  March 21, 2025                    Respectfully submitted,

                                          */s/ Kelley F. Farrell*
                                          Kelley F. Farrell, #43027
                                          Blitz, Bardgett & Deutsch, L.C
                                          120 South Central Avenue Suite 1500
                                          St. Louis, Missouri 63105
                                          Phone: 314-863-1500
                                          Fax: 314-863-1877
                                          Email:  kfarrell@bbdlc.com


                                          Dan Goldman (*pro hac vice forthcoming*)
                                          Alexis Federico (*pro hac vice forthcoming*)
                                          Bienert Katzman Littrell Williams LLP
                                          903 Calle Amanecer, Suite 350
                                          San Clemente, California 92673
                                          Email:  dgoldman@bklwlaw.com
                                                  afederico@bklwlaw.com